Filed 1/27/14  P. v. Mosely CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>THETHESIUS MOSLEY,<br><br>    Defendant and Appellant. | B237690<br><br>(Los Angeles County<br>Super. Ct. No. LA063170) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Susan Speer, Judge.  Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul R. Roadarmel, Jr., and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Thethesius Mosley of assault to commit a felony during the commission of a burglary (Pen. Code, § 220, subd. (b))[1] (count 1); three counts of forcible rape (§ 261, subd. (a)(2)) (counts 2, 3 & 4); forcible oral copulation (§ 288a, subd. (c)(2)) (count 6); sexual penetration by a foreign object (§ 289, subd. (a)(1)) (count 7); and first degree burglary (§ 459) (count 9). The jury found true the allegations that in the commission of counts 2, 3, 4, 6, and 7, defendant personally used a deadly weapon. (§ 12022, subd. (b)(1).) The jury also found defendant committed counts 2, 3, 4, 6, and 7 during the commission of a burglary with the intent to commit forcible rape. Defendant admitted having suffered a prior prison term under section 667.5.

The trial court sentenced defendant to state prison for 53 years to life. The sentence consisted of the following: concurrent terms of 25 years to life in counts 2, 3, and 4, plus one year for the weapon enhancements in these counts; concurrent terms of 25 years to life in counts 6 and 7, plus one year for the weapon enhancements in these counts to be served consecutively to the sentences in counts 2, 3, and 4. The trial court imposed one additional year for defendant's prior prison term enhancement. In count 1, the trial court imposed life with the possibility of parole and stayed the sentence pursuant to section 654. In count 9, the trial court imposed the high term of six years, which was stayed pursuant to section 654.

Defendant appeals on the grounds that: (1) the denial of his posttrial *Faretta*[2] motion violated his federal constitutional right to self-representation and is reversible per se; (2) the trial court erroneously denied his mistrial motion following the prosecutor's improper question to the DNA expert; and (3) the trial court abused its discretion in failing to remove a sleeping juror.

---

[1] All further statutory references will be to the Penal Code.

[2] *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

# FACTS

## Prosecution Evidence

In September 2009, L.J. lived alone in unit 103 on the second floor of an apartment building in Van Nuys. She was 25 years old at the time of trial. On September 16, 2009, L. went to bed at approximately 10:00 p.m. She was almost six months pregnant. Because it was hot, she left open the sliding door to her balcony.

Later that night, something woke her from a deep sleep, and she saw someone standing over her. L. began screaming and the intruder told her to shut up or he would kill her. L. saw that the intruder, whom she later identified as defendant, was Black, had an unmaintained Afro hairdo, and was shirtless. Defendant was holding a steak knife with a blade approximately four inches long.

L. believed defendant would kill her. She asked him to leave because she was pregnant. Defendant agreed to leave, but then began talking. He told L. that she had better not tell anyone he had been there, and she promised not to. Defendant kept saying that she would tell. He told her he had been in her apartment before and that the Mexicans told him that she left her door open. She did not leave her door open, but she said she would not do that again. Defendant said he had just been released from jail after serving a 13-year sentence, and he did not want to return to jail.

Defendant then said he needed sex because he had just been released from jail. L. asked why he did not hire a prostitute. Defendant replied, "If I had money, if you had money, I would have just left." Defendant told L. he took her cell phone and $7 from her nightstand. Defendant said that L. was a pretty girl and after seeing her lying on the bed with her legs up, he could not help himself. He told her to lie on the bed. L. pleaded with defendant to use a condom because she did not want her baby "to get anything." Defendant let her get up to look for a condom, but she could not find one. Defendant told her to get back in the bed.

At this point, L. was still wearing a shirt but no underwear. She did not remember how it came off. Defendant got on top of her and inserted his penis into her vagina. She looked around for a way to escape and saw that the knife was next to the pillow. When

she attempted to slowly move her arm toward the knife, defendant said, "[W]hat the fuck [are you] doing?" She replied, "Nothing, I'm scared, I just wanted to get the knife away from you so you couldn't hurt me or my baby."

Defendant seemed angry. It seemed to L. that defendant was having a hard time putting his penis inside her, but she recalled him putting it inside her three separate times during the entire time he was there. In between, he would start talking again. Defendant put his mouth on her vagina and on her rectum. He also inserted his fingers in her vagina and rectum. He made her put her fingers in her vagina and then in his mouth and repeat the act. When L. asked defendant if she could use the bathroom, defendant said, "no," and he forced her to urinate into a foot tub at the foot of the bed. She asked if she could wipe herself, and defendant said he wanted to lick the urine off her.

Defendant again began talking about jail and said, "I can't go back to jail, I can't let you live." At this point, she knew that if she did not escape, he would kill her. She ran to the front door and attempted to get out, but she was shaking so much she could not undo the locks. When defendant came out of the bedroom and ordered her to go back in, she ran out to her second floor balcony and climbed over the rail. As she hung from the rail, she realized she was too high to jump. She began screaming, and people began coming outside. L. yelled, "He's in the apartment, he's in the apartment." L. saw defendant coming down the stairs and yelled, "That's him." When she saw her neighbors begin to chase after defendant, she pulled herself back onto her balcony and climbed over to the neighbor's balcony.

Daniel Guido lived in an apartment next to L. and heard her screams. Guido then heard her banging on his balcony door. He let her in and gave her a towel. She was "freaked out," crying and shaking. She said that someone had sneaked in and raped her. A friend of L.'s came to the apartment and took L. away.

Michael Rotella, another neighbor, also heard a woman screaming, "Help me," and "He's trying to kill me." Rotella ran outside his apartment and saw a woman on a balcony. She was nude from the waist down. The woman pointed to a man running from the scene. Rotella ran after him, but, by the time he turned the corner of a building, the

4

man was "pretty much gone." Rotella described the man as a stocky African-American between five feet eight inches to six feet in height. He was not wearing a shirt, and Rotella was "pretty sure" he had blue sweatpants on. Rotella's 911 call was played for the jury.

Siddeeqah Carter was L.'s neighbor, and she had known L. since the fifth grade. Carter heard L. scream, "Someone's trying to kill me." Carter and her cousin ran outside while calling 911 and saw L. hanging off her balcony. L. was screaming, "He's still in my house . . . he's trying to kill me. I just been raped." Carter saw a man calmly walking down the stairwell from L.'s apartment. When L. screamed, "That's him," the man began to run. Carter described the man as wearing red shorts, and some type of dirty old shoes. He was shirtless. She and her cousin ran after him but lost him when he turned a corner. Carter said the man was dark-skinned, had wild hair, and was "kind of chunky."

At approximately 2:00 a.m. on September 17, Officers Jose Cuadra and Thomas Bangasser of the Los Angeles Police Department (LAPD) arrived at L.'s apartment after receiving a call about an attack victim. Officer Cuadra encountered a Black female who said she had been raped. She was hysterical and crying. She was wearing only a T-shirt. The victim described her attacker as a male Black with black hair in a two- to three-inch Afro, brown eyes, and wearing a red shirt and black shorts. She said he was approximately 45 to 50 years old.

Carter told Officer Bangasser that she saw a Black male walking down the steps from the area of L.'s apartment. He was wearing either long shorts or jeans that were black and a red shirt. She saw him running toward the rear parking lot. He had a two-inch to three-inch Afro.

LAPD Detective Cheri Roberts of the sex crimes unit arrived at L.'s apartment at approximately 4:30 a.m. Detective Roberts did a walk-through of L.'s apartment and saw a knife on top of the fish tank that matched knives in a kitchen drawer. The detective collected evidence from the apartment, including the bedding, and interviewed L. and other witnesses. Detective Roberts obtained a surveillance video recording from the manager of the apartment complex. The surveillance video showed the rear parking lot

5

of L.'s apartment complex and was recorded on September 17, 2009, between 2:00 a.m. and 2:29 a.m. The video depicted a male Black, who appeared to be wearing pants and no shirt, running towards the cars. He was shown pulling up his pants, and a portion of his white-colored underwear was visible in the waist area. The DVD of the video recording was played for the jury.

Marie Meekins lived in the same apartment complex as L. She saw defendant on September 16, and she knew him previously through her friend Diane, who was a girlfriend of his. Diane used to live in unit 103. Diane moved out in February or March of 2009. On September 16, Meekins saw defendant as she walked her daughter home from school. He was in a car with another friend of Meekins, and they gave her a ride home. Defendant asked Meekins to braid his hair. Meekins saw defendant again at approximately 10:00 p.m. at the gate of her apartment complex. She refused to do his hair because he was intoxicated. Defendant said to Meekins, "Tell that white bitch Diane that I'm out."

Meekins recalled that in December of 2006, she and Diane were sitting in the bedroom of Diane's apartment. Diane was terrified of defendant. The front door and bedroom door were both locked. Defendant knocked on the door and said, "Diane, open the door." Diane asked him how he got in the apartment, and defendant said he climbed in through the balcony. Defendant had an extension cord, and he choked Diane and "whooped her on the leg" in front of Meekins.

As a result of her investigation, Detective Roberts was able to obtain a photograph of defendant and place it in a photographic lineup, or six-pack. On September 22, 2009, she showed the six-pack to L. and Carter. L., after being properly admonished, circled the photograph in position No. 5. Carter separately viewed the six-pack photographic lineup and circled the photograph in position No. five. Upon obtaining the six-pack identifications from L. and Carter, Detective Roberts contacted defendant's parole officer and obtained the location of defendant's residence, which was his uncle's house.

On September 23, 2009, Detective Roberts and her partner, Detective Luz Montero, conducted a recorded interview of defendant at the Mission police station.

6

Defendant said he used the name Mosley and also the name Johnson and was 43 years old. Defendant agreed to speak with the detectives after he was read his *Miranda*[3] rights, which he said he understood. He told the detectives he was released from prison on September 16 and went to his uncle's house. He did not go to his "old address," which was the apartment complex where the rape occurred. At the time he was released, he had a "little small Afro," but his hair was braided at the interview He acknowledged that he and a friend picked Maria up and dropped her off, referring to Meekins. Defendant asked Maria about doing his hair but did not go back to her place. He acknowledged that he used to live in unit 103 with Diane. He denied going there around 10:00 p.m. on September 16, and he insisted he was at his uncle's. Defendant admitted that he was able to get into Diane's apartment by climbing in through the balcony.

Defendant told the detectives that he could not understand why his fingerprints would be in the apartment, and he believed the results of DNA tests should clear him. He said he had not had sex since he was released from prison because he had an infection on his penis and it hurt him to have sex. The audio recording of the interview was played for the jury, and the transcript of the interview was published to the jury.

Ann Allison is a sexual assault nurse examiner at the Center for Assault and Treatment Center. Allison examined L. on September 17, 2009. Allison's examination of L.'s body showed a scrape-type abrasion to her left inner knee. L. believed she got that when she jumped to the neighbor's balcony. There was redness to the posterior fourchette, which was consistent with some type of blunt trauma or rubbing or irritation. The posterior fourchette is the most common site of irritation when nonconsensual sex has occurred. Allison took DNA samples from L. using oral, genital, and anal swabs following her usual protocol.

LAPD criminalist Penny Reid performed DNA testing on the swabs collected from the victim and included in the rape kit. These included an external genital swab and

---

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436.

7

an anal swab. She also received an oral swab from defendant. She obtained a complete DNA profile for both L. and defendant.

With respect to the anal swab, Reid obtained a partial DNA profile that was a mixture of DNA from at least two individuals. The major profile originated from L. In five of the fifteen markers of the minor profile, defendant was a possible contributor. Reid stated that when one did not assume that L.'s DNA or defendant's DNA was in the mixture, only one in 169 people could be included in five of the 15 markers tested. If one assumed that L. was a contributor, and of course the swab did originate from her, it was calculated to be approximately 2,000 times more likely that defendant was the second contributor versus an individual chosen at random.

In regard to the DNA sample taken from the knife found at the scene, Reid obtained a DNA mixture profile of at least two individuals. L. could not be excluded as a possible contributor to the DNA mixture profile. At 14 out of 15 genetic markers, defendant could not be excluded as a possible contributor to the DNA mixture profile. Using the assumption of 14 out of 15 genetic markers, the combination of genetic marker types observed in the swab of the knife handle occurs in approximately one in 17 million times.

**Defense Evidence**

Mehul Anjaria, who runs his own DNA consulting firm, testified as the defense DNA expert. He explained the nature of DNA, where it is found, and how it is commonly analyzed in crime laboratories. With respect to defendant's case, Anjaria reviewed two DNA testing reports, some additional screening reports, and all of the laboratory bench notes, which consisted of the actual data that came off the testing instrument. He also reviewed the LAPD protocols and the curriculum vitae of the analysts who performed the work. He did not find inadequacies in the way the testing was conducted. He did not disagree with the laboratory work or the written reports. He noted, however, that there was no actual DNA match to defendant.

Anjaria believed that in the mixed sample, where five sites were used in the LAPD statistical calculation, there may have been other DNA types present that were not

detected.  He believed there was degradation in the sample.  Although defendant could not be excluded, there were a number of alternative explanations that were unknown.  He believed that the possibility of one person in 169 being included in the anal swab was the only valid statistic, and he would not have reported the other figure.  He believed it was possible that, on the anal swab, defendant's inclusion was due purely to chance.  With respect to the knife handle, Anjaria agreed with the DNA types that the LAPD crime lab determined, but he emphasized that there were multiple contributors on the knife swab.  Some contributed a low level of DNA, and some information could have been missing.  If the low-level peaks were accounted for, the statistical probability would have been different—perhaps one in the range of the "10 thousands" (rather than one in 17 million).

## DISCUSSION

### I.  Posttrial *Faretta* Motion

#### A.  *Defendant's Argument*

Defendant contends that the trial court was without discretion to deny his posttrial *Faretta* motion because it was made well before sentencing.  He also argues that there was no good basis for denying his request under the factors of *People v. Windham* (1977) 19 Cal.3d 121, 128-129.  Finally, defendant argues that the trial court abused its discretion by relying on the appearance of mental illness to deny his motion.  Defendant seeks reversal of the judgment and remand to exercise his right to self-representation in a motion for new trial and, if denied, resentencing.

#### B.  *Relevant Authority*

It is well established that a defendant in a state criminal prosecution has a constitutional right under the Sixth Amendment to represent himself.  (*Faretta*, *supra*, 422 U.S. at pp. 819–821.)  However, timeliness and an unequivocal assertion are necessary to invoke *Faretta* rights.  (*People v. Windham*, *supra*, 19 Cal.3d at p. 127-128.)  Also, once a defendant has chosen to be represented by counsel, his demands that he be permitted to represent himself are within the trial court's discretion.  (*Id*. at p. 128.)  In assessing a *Faretta* motion subject to the trial court's discretion, the court should consider the "quality of counsel's representation of the defendant, the defendant's prior proclivity

to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Windham*, at p. 128.) "'[I]t also is established that a midtrial *Faretta* motion may be denied on the ground that delay or a continuance would be required.'" (*People v. Jenkins* (2000) 22 Cal.4th 900, 1039; *People v. Clark* (1992) 3 Cal.4th 41, 110.)

### C. *Proceedings Below*

On November 5, 2009, the trial court addressed defendant's request to represent himself. The court informed defendant that his attorney calculated his exposure as 150 years to life and an additional life term. Defendant said that was why he believed it was in his best interest to go pro. per. The court advised defendant of the dangers of representing himself. The trial court informed defendant that his right to self-representation could be terminated by the court if defendant engaged in any serious misconduct or obstructed the conduct and progress of the trial. The court found that defendant voluntarily, knowingly, and intelligently waived his right to be represented by an attorney and granted defendant pro. per. status.

During a proceeding on December 15, 2009, defendant repeatedly requested advisory counsel, but the trial court denied the request. On May 17, 2010, standby counsel, Ms. Mojgan Aghai informed the court that she believed defendant was incompetent to stand trial. The trial court agreed, described some of defendant's behavioral problems, and suspended proceedings. The court ordered two psychiatrists to evaluate defendant under section 1368. On August 25, 2010, based on the reports of the appointed psychiatrists, the trial court found defendant mentally competent to stand trial under section 1368, while expressing deep concerns about defendant's ability to remain in pro. per. The court stated that it was concerned about defendant's psychological condition, particularly his bipolar disorder and how it appeared to affect his behavior in court and ability to put on a rational defense. Addressing defendant, the court stated, "You've demonstrated in front of this court tremendous mood swings and inappropriate emotional outbursts in court just like you demonstrated a moment ago. You have a

10

tendency not to follow the orders of court and constantly interrupt the court and counsel. You have made gratuitous insulting remarks to the court and to me personally during the number of appearances you've made in front of me. Second, I'm concerned about your ability to control your behavior in and out of the courtroom. I'm aware that you have been refusing to take the morning bus to court yesterday and today and you were again acting out and pounding on the wall of your jail cell in the lockup yesterday. Third, I'm concerned about your ability to communicate with the court and jurors due to your thick accent and the misuse of the English language. I will at this time reinstate your pro. per. privileges, but you are again admonished that you must follow court rules. You must not disrupt the dignity or the core integrity of this courtroom."

On March 15, 2011, defendant agreed to give up his pro. per. status and to be represented by his standby counsel at that time, Rebecca Riley. A *Marsden*[4] hearing was held on June 17, 2011, in which defendant complained about Riley's representation during voir dire. He was upset that Riley had excused a potential juror who was a genetic counselor because he believed Riley did not know enough about DNA evidence. The trial court concluded that there was no breakdown in the relationship between Riley and defendant and denied the *Marsden* motion.

In the next court session following the *Marsden* hearing (June 20, 2011), defendant asked the court to reinstate his pro. per. status. The trial court asked defendant if he was ready to resume jury selection right away or if he would need time to prepare. Defendant said he would need time. The trial court denied the motion as untimely. Defendant said he did not "want this lawyer." The trial court stated it was denying his right to go pro. per. because he had a "longstanding pattern of wanting to go pro. per., wanting to be represented." The court expanded on its reasons, stating that defendant had a history of mental illness and disciplinary problems in court, as evidenced by the fact he was wearing a stealth belt. The court stated that defendant did not use the English

---

**4**     *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

language properly and it was almost impossible for the court to understand him, "let alone the court reporter and the jurors." Defendant accused the court of being untruthful and discriminating against him because he was from the South.

On June 21, 2011, following Riley's opening statement, defendant asked the court to forgive him and said that his lawyer was "so competent that I feel like a crazy man." He also asked Riley to forgive him. When asked if he was withdrawing his request to go pro. per. again, he replied, "Of course." Defendant said, "I feel in my spirit she got the best of my interest for justice on my behalf."

Two days later, Riley informed the court that defendant wished to make a *Marsden* motion. Defendant complained that Riley was not making a sufficient case for a flawed identification. He also stated there were "underhand under tailing" and "backroom dealings" occurring and that Riley, being a woman, had sympathy for the victim. She also failed to call the witnesses defendant wanted her to call. He claimed that the sidebars were backroom agreements.

Riley responded that she had consulted with the latest identity expert, who said he could not assist the defense because he believed the identification of defendant was "just fine." With respect to the investigation, Riley stated that defendant's investigator, Mr. Mackey, had contacted one of defendant's witnesses called Tabitha, and Tabitha informed him that defendant had tried to contact her and get her to lie about braiding his hair. Riley did not intend to call Tabitha as a witness. Moreover, defendant kept going back and forth about when his hair was braided, and she found no value in this issue, especially since defendant himself told police his hair was in a short Afro. Riley stated she was doing everything she could to fight for defendant and had never admitted defendant's guilt to the prosecutor or anyone else.

Defendant agreed with the court that his attorney was "the expert," but proceeded to engage in a long discourse about his hair, the artist's sketch, and his identification experts. Finally, the trial court stated that defendant was merely repeating himself and it believed Riley had represented defendant in a forthright and honest fashion and had a great reputation. Defendant said he did not doubt that. The court explained that the

12

sidebars were nothing nefarious. The trial court concluded that there was no breakdown in the relationship between Riley and defendant that would make it impossible for her to effectively represent defendant and denied the *Marsden* motion.

On June 29, 2011, after the jury returned its verdicts, defendant complained to the court that he had not had a fair trial. He complained of witnesses that could have helped exonerate him but that his counsel did not call, and several other issues of which he had previously complained. During the discussion about setting a date for sentencing, defendant made a *Faretta* request. The trial court stated it could be discussed at the next date and proceeded to set the sentencing for July 27, 2011. At the sentencing hearing on that date, the court asked defendant if he wanted to proceed with Riley or have her relieved. Defendant said he wanted to get rid of Riley. The trial court stated it was going to appoint new counsel for defendant to bring the motions for new trial based on incompetency of counsel and any other issues the attorney saw fit to raise. Defendant said he wanted to get pro. per. status "because I need to be—I got 90 more days to put my additional appeal stuff that I know ain't going to be on the record."

The trial court asked if there was an attorney present from the bar panel and then discussed with the bar panel attorney in the courtroom the amount of time necessary for an attorney to be appointed. The trial court suggested to defendant that the matter be continued for a short time for a bar panel attorney to discuss the motions with him. Defendant replied, "Thank you." He stated he would like to speak to the lawyer because he had new evidence. When the bar panel attorney asked the court if defendant was pro. per., the trial court said he was not. At that point, defendant again asked for pro. per. status because he needed "to go in there and do research." The court replied, "The court is declining the defendant's motion to return to pro. per. status for the purpose of motions and sentencing for the following reasons: The defendant has demonstrated a proclivity to seek pro. per. status and then request counsel. The defendant has demonstrated that he is unable to follow the rules in and out of the courtroom, has presented a pattern of disciplinary problems that has disrupted the court and integrity of this courtroom for many months. The defendant has a history of mental illness and mood disorders—that

affects his ability to calmly and effectively litigate issues in this courtroom.  If pro. per., these proceedings would be unduly delayed as the defendant has a pattern of delaying and obstructing the orderly process of this case.  For all these reasons, the defendant's request for pro. per. is denied.  You can take it up on appeal, Mr. Mosley."  Defendant began to rail against the judge and the court and continued to do so until the end of the proceeding, at which time he attempted to knock over the counsel table and had to be forcibly escorted from the courtroom.

### D.  No Abuse of Discretion

Defendant first argues, citing *People v. Miller* (2007) 153 Cal.App.4th 1015 (*Miller*), that the denial of his request for self-representation after the rendering of the verdicts was reversible error.  In *Miller*, the defendant made a request after trial to represent himself at sentencing.  (*Id.* at p. 1019.)  Although the request was made two months before the projected sentencing hearing, the trial court treated it as untimely and exercised its discretion to deny it.  (*Ibid.*)  *Miller* held that the requirement that a *Faretta* motion be made before trial in order to be timely applied only where the defendant sought to represent himself at trial.  (*Miller*, at pp. 1023-1024.)  The defendant's request was timely because it concerned only sentencing and was made "well in advance" of the sentencing hearing, which it deemed "a proceeding separate and distinct from the trial." (*Id*. at p. 1024.)  The defendant therefore had an absolute right to represent himself upon his unequivocal request to do so, provided "he was mentally competent and the request was made 'knowingly and intelligently, having been apprised of the dangers of self-representation.'"  (*Ibid*., quoting *People v. Welch* (1999) 20 Cal.4th 701, 729.)  Since the defendant's right was absolute, reversal followed automatically, and the matter was remanded for resentencing.  (*Miller*, at pp. 1024-1025.)

Defendant's case is distinguishable from *Miller*.  In *Miller*, the defendant's request to represent himself was based on his desire to do his own legal research to "see if anything could help him at sentencing," at which proceeding he declared his intention to represent himself.  (*Miller*, *supra*, 153 Cal.App.4th at p. 1020.)  In the instant case, defendant did not express any interest in the sentencing proceeding; instead, he wanted to

14

represent himself so that he could present new evidence, including witnesses that his attorney did not present, and other evidence that would allow him to "get exonerated off this crime." Defendant also mentioned that he wanted to "put my additional appeal stuff" on the record. These issues demonstrate that defendant wished to relitigate his case rather than prepare for sentencing. Even if we assume that some of his issues were appropriate for a motion for new trial, such a motion is a matter collateral to the sentencing hearing—indeed, a continuation of the trial itself. Unlike the *Miller* defendant, who wished to represent himself in the new proceeding—the sentencing hearing—defendant wished to continue the trial and make a record for appeal. Furthermore, the trial court would not have been remiss had it found defendant's request to be equivocal. When the court told defendant that a bar panel attorney would be appointed, defendant said, "Thank you." Defendant said he wanted to talk to the lawyer. Defendant insisted on pro. per. status when he realized he could not have a lawyer and be pro. per. He appeared to want pro. per. status to have access to the law library, but also to be represented by an attorney at sentencing—an attorney who would presumably make the motions defendant wished him or her to make. It was clearly within the trial court's discretion to grant or deny defendant's *Faretta* motion.

Considering the totality of the circumstances surrounding defendant's request, we can find no abuse of discretion. The trial court was well aware of what would ensue if defendant's motion were granted, having gone through months of interaction with defendant as a pro. per. defendant. A "legitimate concern" of the trial court is whether defendant's request "would needlessly delay the proceedings." (*People v. Doolin* (2009) 45 Cal.4th 390, 454.) Defendant was granted his *Faretta* right on November 5, 2009, after his preliminary hearing on October 22, 2009. He relinquished his pro. per. status on March 15, 2011, which means that his self-representation period lasted one year and four months, all of which was pretrial. Defendant continually filed ex parte motions, some of which were not appropriately categorized as ex parte. He continually attempted to relitigate issues. Defendant repeatedly asked for continuances while simultaneously

15

refusing to waive time, causing needless delay. He would insist on having a continuance without a waiver of his speedy trial right, and then would eventually waive time.

Moreover, although defendant insisted on going pro. per., he continually asked for "advisory counsel" during the proceedings. He consulted with Riley to the degree that the prosecutor complained to the court that, as he was pro. per., defendant should be able to handle things on his own. Defendant asked for funding to have his DNA expert act as advisory "counsel" during trial in order to help defendant question witnesses. He was reminded that he was held to the same standard as an attorney. There is no reason to believe such behavior would not continue if defendant's pro. per. status were reinstated. Defendant also failed to properly account for how his pro. per. funds were used and had to be asked repeatedly for an accounting.

Furthermore, a defendant who deliberately engages in obstructionist misconduct may forfeit his right of self-representation. (*Faretta, supra*, 422 U.S. at pp. 834-835, fn. 46; *People v. Powers* (1967) 256 Cal.App.2d 904, 914-915, disapproved on another point in *People v. Taylor* (2009) 47 Cal.4th 850, 881.) Self-representation is "not a license to abuse the dignity of the courtroom," nor to refuse to "comply with relevant rules of procedural and substantive law." (*Faretta*, at pp. 834-835, fn. 46.) On January 26, 2010, during one of the numerous ex parte hearings he requested, defendant said to the court, "You presentin' virus is no way—I can say this on the record. I'm not—you presentin' virus, taking sides with—you are supposed to be like an impound, even-handed." Defendant then began yelling at the court, "I want you off my case. I want you off my case" repeatedly. Apparently defendant had worked himself into a frenzy and had to be handcuffed, at which point he said, "You ain't got to cuff me. I ain't going to do nothing. I'm facin' fuckin' life and you are telling me? I want advisory counsel. What the hell you talking about? I'm facing life off these fuckin' lies." Defendant had to be forcibly removed from the courtroom. On April 28, 2010, defendant complained to the court about his first standby attorney and wanted her relieved because she refused to file certain motions.

16

Defendant continually accused the court of mistreating him and said, "You for your own professional reason excuse yourself off my case or move me to another courtroom." When the court stated it believed it was fair and asked defendant to waive time unless he wanted to go to trial on May 17, defendant said, "You coming with so much chicanery and trickery and shenanigans, it don't make no sense." The trial court later warned defendant twice not to interrupt the court. On May 11, 2010, the trial court denied defendant's petition for writ of habeas corpus. The court told defendant that there was no factual or legal basis for relief, the motion was untimely, and the issues had already been litigated. Defendant told the court that a pro. per. "attorney" got no respect and the court was being more aggressive. He stated that "the system that we're up under is—have been preplanned and predestined to always keep the Black man in slavery. I mean, this is a slavery court and I know it is and I know my motion had grounds"

On June 16, 2011, the trial court ordered defendant to be restrained by a stealth belt. The trial court noted defendant's aggressive in-court behavior, his 11 disciplinary reports, his threats to Sheriff Department personnel and jail nurse, his fights with deputy sheriffs, his threat to kill a deputy sheriff, and his claim to have "killed cops before" and willingness to do it again. We have described other instances of defendant's abuse of the dignity of the courtroom in the procedural history.

Defendant also displayed poor communication skills. Defendant told the court on the day he went pro. per., "Well, it's like this here, you know the courts today is—there are courts they don't follow the rules of government, they go by what they want to do. They basically because I had—I mean, not to bring this up, but I had—that's why I say that I have to file a motion for change of venue or whatever because I also had in the courts—I had jailers that have took my right to my jury trial." During a discussion of discovery issues, defendant claimed, "It's just all assumptions and rumors and gospels and that the position of rumors—okay, what I'm saying, this case is rumors upon rumors, supposition upon supposition, gossip is what this whole case is based upon. It's assuming and the assumptions is why some type of theoretical broadway." At the close of the proceeding, defendant said, "Make sure that you see what I'm talking about now.

17

This is scratch—this is like—this is like—man, this is crazy. So you all like to take my rights and say, okay, you know what, you are just another Willie McGee like junk pro type stuff." Defendant said he would contact the ACLU and the "NCAA for Eric Holder, Justice Department."

The record thus shows that defendant "manifested an inability to conform his conduct to procedural rules and courtroom protocol." (*People v. Watts* (2009) 173 Cal.App.4th 621, 630.) "[A] defendant requesting the right of self-representation must possess the ability and willingness 'to abide by rules of procedure and courtroom protocol.' [Citation.]" (*Id*. at p. 629, fn. omitted.) Under the relevant factors, therefore, the trial court did not abuse its discretion. (See *People v. Windham*, *supra*, 19 Cal.3d at p. 128.) The quality of Riley's representation was not an issue, since defendant made it clear that he would complain of ineffective assistance of counsel, and Riley could not represent him on such a claim. The trial court reasonably determined that a different attorney was required to present this claim in a new trial motion. Although there was no showing that appellant sought *numerous* substitutions of counsel, this factor alone does not undermine the trial court's decision. (See *People v. Burton* (1989) 48 Cal.3d 843, 854.) In any event, the record shows that defendant got rid of his first attorney when he chose to represent himself and then insisted that his standby counsel, Mojgan Aghai, be dismissed, leading to Riley's appointment. He vacillated between praising Riley and making *Marsden* motions. As we have noted, defendant's reasons for the *Faretta* request were inadequate, focusing on relitigating his innocence rather than on the sentencing hearing. He had succeeded in inordinately prolonging the length of the proceedings prior to trial. Finally, our summary of defendant's conduct during trial, which mentions only a few of many incidents, shows that disruption and delay of the remaining proceedings were inevitable had defendant been allowed to proceed in pro. per. again.

As for defendant's claim that the trial court abused its discretion by relying on the appearance of mental illness to deny self-representation, we disagree with defendant's premise. Defendant's history of mental illness was mentioned in the trial court's ruling only as one of the reasons for his disruptive behavior. Early on, defendant himself asked

for an order to get his "psyche meds" that he needed to keep calm. At the hearing prior to ordering defendant to be evaluated, Aghai told the court she believed defendant was extremely paranoid and had tremendous, volatile mood swings. The court stated, "He has called the court names such as engaging in slave trade, expressed that the court is prejudiced because of the occupation of my spouse, and had made other accusatory-type comments and has essentially had difficulty following the court's instructions and orders, such as speaking over the court, not listening to the court. He's been admonished several times. I certainly have not made any observations that he is psychotic. I'm certainly not a psychiatrist. But it is my opinion that he is extremely paranoid and that paranoia has affected his ability to conduct a reasonable defense and he's made a lot of unreasonable, irrational requests that he cannot justify."

In *Indiana v. Edwards* (2008) 554 U.S. 164, the United States Supreme Court clarified that the federal Constitution "permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky*[5] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Id*. at pp. 177-178; see also *People v. Johnson* (2012) 53 Cal.4th 519, 530-531 [Cal. courts may exercise the discretion permitted in *Edwards*].) In this case, defendant was evaluated by two psychiatrists who apparently reported that defendant suffered from bipolar disorder. The court did not improperly take this information into account when deciding whether to allow defendant to return to pro. per. status. The court had endured a great deal of "emotional outbursts," "gratuitous insulting remarks," and disobedience to the orders of

---

**5**      *Dusky v. United States* (1960) 362 U.S. 402 (requiring defendants to have a rational and factual understanding of the proceedings against them and sufficient present ability to consult with their lawyers with a reasonable degree of rational understanding before being deemed mentally competent to stand trial).

the court, but yet allowed defendant to return to pro. per. status on August 25, 2010, after his evaluation, despite its deep concerns.  Once defendant relinquished his pro. per. status, the trial court was not obliged to return to laboring under these concerns, which had been proved to be more than justified over the ensuing months.

Defendant's claim on appeal that he "represented himself capably for many months" is not validated by the record.  The trial court, given defendant's history, which is reflected in the record, was justified in believing that defendant would do everything he could to delay and obstruct sentencing and to disregard the court's orders.  We conclude there was no abuse of discretion, and defendant suffered no violation of his constitutional right of self-representation.

## II.  Denial of Mistrial Motion

### A.  Defendant's Argument

Defendant next claims the prosecutor committed misconduct during her examination of Reid, the LAPD criminalist, by attempting to elicit inadmissible evidence that was highly prejudicial to defendant.  According to defendant, the question violated his right to due process and to a fair trial.  Defendant adds that his motion for a mistrial based on this misconduct should have been granted.

### B.  Proceedings Below

During the prosecutor's examination of Reid, the following exchange occurred:

"Q.  So you give notice to the detective before using a sample in its entirety?

"A.  That is correct.  There are instances where we would not be able to get any or a complete DNA profile from sampling only a portion of a stain and in that instance we must consume everything, but we would give notice first.

"Q.  Okay.  And that's so that if the lab—defense lab wants to do some testing, they can be present during your testing or they can have access to your results and all of your reports and notes to make sure that you've done your job right; correct?

"A.  That is one reason.  Another reason would be for future testing.  If in 20 years technology's been proved [*sic*] such that if I don't get a profile and there's sample remaining, they can do future testing on the sample.  Kind of a two-edged sword.

"Q. Do you know if evidence was in fact stored and—properly stored and eventually received by the defense—

"[Defense counsel]: Objection, your Honor.

"Q. —for testing?"

The court called for a sidebar, and defense counsel stated she was making a motion for mistrial. Defense counsel stated, "She's going to put it before the jury that there was testing done by the defense and that obviously we don't present the testing; therefore, [the jury] can make the assumption that it was bad for us." The prosecutor protested, "We ask DNA experts that all the time." She maintained that the expert could not testify whether the defense tested the DNA or not, but only about her protocols of ensuring that the evidence is maintained and stored properly and, if she had percipient knowledge, whether it was checked out to the defense. Defense counsel countered by arguing that the proffered evidence was irrelevant and highly prejudicial, since there would be no evidence presented about tests conducted by the defense. The trial court concluded that the testimony would be excluded on the grounds that the witness did not have personal knowledge that anything was picked up or tested. After hearing readback, the trial court stated there was nothing to strike. The objection was sustained and the motion for mistrial was denied.

### C. Relevant Authority

"The applicable federal and state standards regarding prosecutorial misconduct are well established. '"A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves '"'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"' [Citation.] As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.

[Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) "In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 970.)

Even if a defendant shows that prosecutorial misconduct occurred, reversal is not required unless the defendant can demonstrate that a result more favorable to him would have occurred absent the misconduct or with a curative admonition. (*People v. Arias* (1996) 13 Cal.4th 92, 161.)

"'It is, of course, misconduct for a prosecutor to "intentionally elicit inadmissible testimony." [Citations.]' [Citation.] Such misconduct is exacerbated if the prosecutor continues to attempt to elicit such evidence after defense counsel has objected. [Citation.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 960; *People v. Bell* (1989) 49 Cal.3d 502, 532.)

### D. No Misconduct or Prejudice

We agree with respondent that defendant's claim of prosecutorial misconduct is forfeited. Defense counsel's objection to the question did not preserve a claim of prosecutorial misconduct, and counsel did not request the jury be admonished to disregard the alleged impropriety. (*People v. Thomas* (2012) 54 Cal.4th 908, 938-939.) Moreover, defendant fails to present any argument that an admonition from the trial court would not have cured the harm allegedly created by the prosecutor's question. (*People v. Earp* (1999) 20 Cal.4th 826, 858-859; see also *People v. Boyette* (2002) 29 Cal.4th 381, 447 [holding that claim of misconduct was not preserved where defense counsel failed to request the jury be admonished, where there was no indication such a request would be futile or that counsel's failure to so request was so prejudicial as to constitute ineffective assistance].) For these reasons, defendant's claim of prosecutorial misconduct is forfeited.

In any event, defendant's claim is without merit. According to defendant, the misconduct consisted of the prosecutor's asking Reid a question that implied that the defense was hiding something. We disagree. The prosecutor committed no misconduct in asking whether the defense had an opportunity to test the DNA evidence. (See *People v. Cook* (2006) 39 Cal.4th 566, 607 ["[p]ointing out that contested physical evidence could be retested did not shift the burden of proof"].) The prosecutor did not ask whether the evidence was retested, or even if the defense took possession of any DNA evidence. The prosecutor merely asked if Reid *knew* if the evidence was eventually received by the defense, at which point she was interrupted by the defense objection. Reid was given no opportunity to answer. In order for a prosecutorial question to become misconduct because of its adverse implications to the defendant, the question must imply facts a prosecutor cannot prove. (*People v. Warren* (1988) 45 Cal.3d 471, 480-481; *People v. Earp*, *supra*, 20 Cal.4th at pp. 859-860 ["a prosecutor commits misconduct by asking 'a witness a question that implies a fact harmful to a defendant unless the prosecutor has reasonable grounds to anticipate an answer confirming the implied fact or is prepared to prove the fact by other means'"].) Such is not the case here. Reid could not testify to anything more than whether or not she knew if the evidence was picked up by a defense representative. Even if the question had been answered, the prosecutor committed no act so egregious that it infected the trial with unfairness, nor can posing such a question be considered a deceptive or reprehensible tactic.

Moreover, the court instructed the jury with CALCRIM No. 222, in pertinent part, as follows: "Nothing that the attorneys say is evidence. . . . Their questions are not evidence. . . . The attorneys' questions are significant only if they helped you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggested it was true. During the trial, the attorneys may have objected to questions or moved to strike answers given by the witnesses. . . . If I sustained an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did." Accordingly, we cannot assume, and we believe it unlikely, that the jury

23

interpreted the prosecutor's interrupted question as a statement of fact or evidence of that fact. We are satisfied that the trial court's instructions were sufficient to offset any impact the question had on the jury, and defendant suffered no prejudice from the prosecutor's question. (*People v. Bell*, *supra*, 49 Cal.3d at p. 542.) We also conclude defendant did not suffer a violation of his rights to due process and a fair trial, and the motion for mistrial was properly denied.

## III. "Sleeping" Juror

### A. *Defendant's Argument*

Defendant argues that the trial court abused its discretion by failing to replace the jurors noted by defendant as having slept through his DNA expert's testimony. Specifically, defendant contends the trial court had no choice but to discharge at least the one sleeping juror that the court personally observed and replace her with an alternate. Defendant maintains the trial court's failure in this regard deprived him of his right to a fair trial and due process.

### B. *Proceedings Below*

During a discussion of jury instructions, the following exchange occurred: "The Defendant: When Mr. Anjaria [his DNA expert] was doing his testimony being cross-examined today, I looked and I seen Juror 14, 13, and 3—14, 12, and 3, they were sleeping.

"The Court: The only thing that came to my attention, my observation, is that [Juror] No. 14 closed her eyes for a while but I watched her. She reopened them, she looked asleep, but I think she was awake.

"The Defendant: Well, when I did it, I watched her for a minute—I watched all of them and she was doing like this (indicating) and she did that for a few minutes. When I first seen her, I thought she was just concentrating trying to hear what was going on, maybe more concentration, then she did like this here (indicating). I was like wow and she did it again, so I brought it to my lawyer's attention and she said, well, they just tired like that.

"The Court: The only one I observed was [Juror No.] 14 and it was brought to my attention by the bailiffs. I continued to observe her. She may have nodded off for a

moment, but she definitely was awake. As to any other jurors, I saw nothing, I was informed of nothing. The court should have been made aware of it, should have been brought to my attention.

"The Defendant: I was trying. I kept calling Deputy Starkey to let him know to help me observe the people sleeping.

"The Court: All right. And I was informed of [Juror No.] 14 only.

"The Defendant: Ma'am, well maybe, but I'm telling you I wouldn't bring it up. I let the deputies observe it with me. I would have no reason to lie. I thought maybe she just got her eyes closed. They were basically sleeping, three jurors sleeping, actually nodding.

"The Court: Mr. Mosley, I didn't see it. If they've missed anything, they are entitled to readback. Again, if something's occurring at that moment, you should bring it to my attention then—

"The Defendant: Again, I tried.

"The Court: —not after the fact when I can't wake them up.

"The Defendant: Ma'am, if I was to just blurt out like that in the courtroom, I'm pretty sure you would sanction me or give me a restraining move.

"The Court: Pass a note to your attorney or ask for a recess.

"The Defendant: Right, I did—okay, well, I didn't know that, nobody gave me instruction. I heard none of my instruction. But I did contact the deputy every—each time and I asked him to help me and he went to the clerk and passed her a note and she passed it to you. I got it wrote down how long I observed them and everything, so I contacted him.

"The Bailiff: My observations were the same as yours, your Honor.

"The Court: As to [Juror No.] 14 nodding a bit?

"The Bailiff: No other nodding from other jurors.

"The Court: I didn't see it.

"The Defendant: Of course, he's going to side with the judge. I mean, I don't blame him, but you think I just laughed at you and was pointing out those people for nothing? I'm not—

"The Bailiff: You pointed them out to me and I watched them.

"The Defendant: Okay, and they were sleeping.

"The Bailiff: No.

"The Defendant: No one else, I'm talking about—just talking about the ones I actually seen myself just sleeping and I wouldn't just make that accusation. I was looking at you. Even if I was crazy, I had more sense than just call you and make a blatant lie like that.

"The Court: If you wish, we can make [Juror No.] 14 the alternate and put [Juror No.] 12 in.

"[Defense counsel]: No, your Honor, I'd prefer it to stay the same way. As I observed— obviously, I couldn't observe them constantly, but they seemed—all the jurors seemed to pay attention to the important testimony.

"[The prosecutor]: That's my understanding of what was happening."

### C. Relevant Authority

A trial judge "must conduct a sufficient inquiry to determine facts alleged as juror misconduct 'whenever the court is put on notice that good cause to discharge a juror may exist.'" (*People v. Davis* (1995) 10 Cal.4th 463, 547; see also *People v. Bradford* (1997) 15 Cal.4th 1229, 1348 (*Bradford*); *People v. Williams* (1997) 16 Cal.4th 153, 231.) In order to justify investigation, there must be more than mere speculation of juror misconduct. Before a juror may be dismissed, the juror's inability to perform must appear as a """"demonstrable reality."""" (*Williams*, at p. 231.) Both the decision to investigate and the decision as to whether there was misconduct justifying discharge rest in the trial court's sound discretion. (*Bradford*, at p. 1348.) In determining whether juror misconduct occurred we accept the trial court's credibility findings if supported by substantial evidence. (*People v. Mendoza* (2000) 24 Cal.4th 130, 195.)

### D. No Abuse of Discretion

*Bradford* specifically addressed the issue of sleeping jurors and found no abuse of discretion when the trial court failed to conduct an inquiry into the fitness of a juror whom the trial court itself had observed sleeping at one point during the trial. The trial court was also aware that the same juror had slept all day on the previous day. (*Bradford*,

*supra*, 15 Cal.4th at pp. 1347-1348.) *Bradford* held that a trial court's failure to adequately inquire into a juror's alleged inattentiveness is rarely cause for overturning a verdict. "We have observed that '[a]lthough implicitly recognizing that juror inattentiveness may constitute misconduct, courts have exhibited an understandable reluctance to overturn jury verdicts on the ground of inattentiveness during trial. In fact, not a single case has been brought to our attention which granted a new trial on that ground. Many of the reported cases involve contradicted allegations that one or more jurors slept through part of a trial. Perhaps recognizing the soporific effect of many trials when viewed from a layman's perspective, these cases uniformly decline to order a new trial in the absence of convincing proof that the jurors were actually asleep during material portions of the trial. [Citations.]' [Citation.] [¶] Although the duty to inquire as to juror misconduct is activated by a lower threshold of proof, in the present case the absence of any reference in the record to the juror's inattentiveness over a more substantial period indicates that the trial court did not abuse its discretion in failing to conduct an inquiry." (*Id*. at p. 1349, italics omitted.)

The circumstances here clearly fail to meet the high threshold set in *Bradford*. In this case, only defendant's self-serving statements attested to three jurors sleeping during testimony. "'[T]he mere suggestion of juror "inattention" does not require a formal hearing disrupting the trial of a case. [Citation.]' [Citation.]" (*Bradford*, *supra*, 15 Cal.4th at p. 1348.) Defendant reportedly told the bailiff of his observations, but the bailiff told the court that his observations matched those of the court. Even defendant's attorney refused the option of having Juror No. 14 replaced with an alternate and stated that all of the jurors appeared to pay attention to the "important testimony." Defendant's claims alone do not give rise to a demonstrable reality of Juror No. 14's inability to perform her duties as a juror. (*People v. Williams*, *supra*, 16 Cal.4th at p. 231.) On this record, the court acted well within its discretion to conduct no further inquiry into the allegation of Juror No. 14's sleeping and did not abuse its discretion in retaining Juror No. 14 and relying on its own observations of the jurors. (*People v. Espinoza* (1992) 3

27

Cal.4th 806, 821.) Defendant did not suffer a violation of his rights to due process and a fair trial.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.